Vladimir MATUSEVITCH, Plaintiff,

v.

Vladimir Ivanovich TELNIKOFF,
Defendant.

Civ. A. No. 94–1151 RMU.

United States District Court,
District of Columbia.

Jan. 27, 1995.

Arnon D. Siegel, David C. Finn, Davis
Polk & Wardwell, Washington, DC, Jerome
G. Snider, Davis Polk & Wardwell, New York
City, for plaintiff.

Forrest A. Hainline, III, Washington, DC,
for defendant.

Barbara McDowell, Stephen F. Smith, Jones, Day, Reavis & Pogue, Washington, DC, for amicus curiae Anti–Defamation League of B'nai B'rith.

Laura R. Handman, Robert D. Balin, Lakenau Kovner & Kurtz, New York City, Lee Levine, Roland G. Schroeder, Ross, Dixon & Masback, Washington, DC, for amicus curiae The New York Times Co., National Broadcasting Co., The Associated Press, Cable News Network, Magazine Publishers of America, News America Publishing, Inc., and The Copley Press, Inc.

## MEMORANDUM ORDER

### Granting Plaintiff's Motion for Summary Judgment

URBINA, District Judge.

Upon consideration of Plaintiff's Motion for Summary Judgment, Defendant's Opposition thereto, Defendant's Motion to Dismiss and for Summary Judgment, Plaintiff's Opposition thereto, Plaintiff's Motion to Dismiss Defendant's Counterclaims or for Summary Judgment, and the briefs filed by amicus curiae,[1] the court grants summary judgment for the Plaintiff. The court finds that there is no genuine issue as to any material fact as 1) Maryland statutory law indicates that the defendant holds an unrecognized foreign judgment and 2) plaintiff's statement is considered by the Supreme Court to be protected speech under the First Amendment. Because recognition and enforcement of a foreign judgment, based on libel standards that are repugnant to the public policies of the State of Maryland and the United States, would deprive the plaintiff of his First and Fourteenth Amendment rights, the court grants summary judgment for the plaintiff as a matter of law.

## I. Recognition of a Foreign Judgment

### A. *The Uniform Foreign–Money Judgments Recognition Act of 1962 and the Uniform Enforcement of Foreign Judgments Act of 1964*

Before a party can enforce a judgment from a foreign country in the United States, the moving party must have the foreign judgment recognized by the state in which he is seeking to enforce the judgment. In the State of Maryland, the Uniform Foreign–Money Judgments Recognition Act of 1962 (the "Recognition Act") and the Uniform Enforcement of Foreign Judgments Act of 1964 (the "Enforcement Act") govern the procedure for the recognition and enforcement of a foreign judgment.

■ The Recognition Act in MD.CODE ANN., CTS. & JUD.PROC. section 10–703 states: that

> "[e]xcept as provided in section 10–704, a foreign judgment meeting the requirements of section 10–702 is conclusive between the parties to the extent that it grants or denies recovery of a sum of money. The foreign judgment is enforceable in the same manner as the judgment of a sister state which is entitled to full faith and credit."

Section 10–704 lists a number of grounds for non-recognition of a foreign judgment, four which are mandatory grounds and five which are discretionary grounds for non-recognition. Therefore, before a party can enforce a foreign-country judgment, the Recognition Act requires a proceeding to determine preliminarily whether the court should recognize the foreign-country judgment. See RESTATEMENT (THIRD) OF THE FOREIGN RELATIONS LAW OF THE UNITED STATES section 481 cmt. g (1986) (noting that "enforcement of a debt arising out of a foreign judgment must be initiated by civil action, and the judgment creditor must establish a basis for the exercise of jurisdiction by the enforcing court over the judgment creditor or his property").

■ Once the court recognizes the foreign-country judgment, the moving party can simply file that judgment in order to enforce it. Section 11–802 states that:

> (a) Generally—(1)(i) Except as provided in subparagraphs (ii) and (iii) of this paragraph, a copy of any foreign judgment

---

1. The Anti–Defamation League, The New York Times Company, Inc., The Associated Press, National Broadcasting Company, Inc., Cable News Network, Inc., The Copley Press, Inc., and Magazine Publishers of America's filed as amicus curiae.

authenticated in accordance with an act of Congress or statutes of this State may be filed in the office of the clerk of a circuit court.

(2) The clerk shall treat the foreign judgment in the same manner as a judgment of the court in which the foreign judgment is filed.

Filing a foreign-country judgment for enforcement purposes, however, remains contingent on the judgment's initial recognition. See *Guinness PLC v. Ward,* 955 F.2d 875, 891 (4th Cir.1992) (stating that "had Maryland not adopted the Uniform Recognition Act, we would certainly agree that under Maryland law the Uniform Enforcement Act is inapplicable to a judgment of a foreign country ... we see no persuasive reason to conclude that the Uniform Enforcement Act is not applicable to a foreign country judgment once such judgment has been found to be entitled to recognition under the Uniform Recognition Act").

Although the Enforcement Act allows a party to bypass the Recognition Act by merely filing a foreign judgment, it limits when a party can use this procedure. Section 11–801 of the Enforcement Act states that judgments entitled to full faith and credit may be filed under the Act; the Enforcement Act has narrowed the definition of "foreign judgment" to *only* judgments of U.S. federal courts or of the courts of sister states. See *Hilton v. Guyot,* 159 U.S. 113, 163–64, 182–88, 16 S.Ct. 139, 143, 150–52, 40 L.Ed. 95 (1895) (stating that while judgments of sister states are constitutionally entitled to full faith and credit, judgments of foreign countries are not).

In this case, the court finds that the defendant filed the foreign-country judgment with the Clerk of the Circuit Court of Montgomery County, Maryland. The defendant, however, never attempted to get that judgment recognized before filing, as required by statute. Consequently, the court determines that the defendant currently holds an unrecognized foreign-country judgment from the State of Maryland. The defendant must obtain recognition of this judgment in order to enforce it.

**B.  *Nonrecognition of a Foreign Judgment***

Irrespective of the procedure, the Recognition Act lists mandatory and discretionary grounds for non-recognition. Section 10–704(b)(2) states that a foreign judgment need not be recognized if "the cause of action on which the judgment is based is repugnant to the public policy of the State."

Case law illustrates that United States courts have refused to recognize foreign judgments based on public policy grounds. In *Laker Airways v. Sabena Belgian World Airlines,* 731 F.2d 909, 931 (D.C.Cir.1984), the court stated that it "is not required to give effect to foreign judicial proceedings grounded on policies which do violence to its own fundamental interests." In *Tahan v. Hodgson,* 662 F.2d 862, 864 (D.C.Cir.1981), the court stated that the "requirements for enforcement of a foreign judgment expressed in *Hilton* are that ... the original claim not violate American public policy ... that it not be repugnant to fundamental notions of what is decent and just in the State where enforcement is sought."

Although principles of comity, defined by the Supreme Court as "the recognition which one nation allows within its territory to the legislative, executive, or judicial acts of another nation, having due regard both to international duty and convenience, and to the rights of its own citizens or of other persons who are under the protection of its laws", are taken under consideration, the Supreme Court has ruled that comity "does not require, but rather forbids [recognition] where such a recognition works a direct violation of the policy of our laws, and does violence to what we deem the rights of our citizens." *Hilton,* 159 U.S. at 164, 193, 16 S.Ct. at 143, 154.

Two recent cases, *Abdullah v. Sheridan Square Press, Inc.,* No. 93 Civ. 2515, 1994 WL 419847 (S.D.N.Y. May 4, 1994) and *Bachchan v. India Abroad Publications Inc.,* 154 Misc.2d 228, 585 N.Y.S.2d 661 (Sup.Ct. 1992), illustrate decisions where courts have failed to recognize a foreign libel judgment grounded on public policy. In *Abdullah,* the court dismissed the claim for libel under

English law, holding that "establishment of a claim for libel under the British law of defamation would be antithetical to the First Amendment protection accorded the defendants." In *Bachchan,* the court declined to recognize or enforce an English libel judgment on both constitutional and public policy grounds.

Although the court recognizes that there is case law rejecting arguments for non-recognition of a foreign judgment based on public policy grounds, those cases are distinguishable in that they concern minor differences in statutory law and in rules of civil procedure or corporate or commercial law. See *Ackermann v. Levine,* 788 F.2d 830, 842 (2d Cir. 1986) (noting that "mere variance with local public policy is not sufficient to decline enforcement").

In this case, libel standards that are contrary to U.S. libel standards would be repugnant to the public policies of the State of Maryland and the United States. Therefore, pursuant to section 10–704(b)(2) of the Recognition Act, this court declines to recognize the foreign judgment.

## II. Deprivation of First and Fourteenth Amendment rights to the Constitution.

### A. *British Libel Law v. U.S. Libel Law*

■ British law on libel differs from U.S. law. In the United Kingdom, the defendant bears the burden of proving allegedly defamatory statements true and the plaintiff is not required to prove malice on the part of the libel defendant. See GATLEY ON LIBEL AND SLANDER 6–7 (Philip Lewis, M.A., ed., 1981) (explaining that "in the tort of defamation the law presumes malice in this sense from the mere act of the defendant in publishing the defamatory matter," that "the state of mind, then, of a person who publishes a libel or slander is immaterial in determining liability". . . ., and that "even a bona fide belief that the words are true will afford no defence in the absence of privilege"); DUNCAN AND

NEILL ON DEFAMATION 51 (Sir Brian Neill, ed., 1983) (explaining that "the law presumes that defamatory words are false and the plaintiff need do no more than prove that defamatory words have been published of him by the defendant; it is for the defendant to prove that the words are true, if he can"). As a result, a libel defendant would be held liable for statements the defendant honestly believed to be true and published without any negligence. In contrast, the law in the United States requires the plaintiff to prove that the statements were false and looks to the defendant's state of mind and intentions. In light of the different standards, this court concludes that recognition and enforcement of the foreign judgment in this case would deprive the plaintiff of his constitutional rights.[2]

### B. *Protected Speech*

Speech similar to the plaintiff's statements have received protection under the First Amendment to the Constitution and are thereby unactionable in U.S. courts. In *Hustler Magazine, Inc. v. Falwell,* 485 U.S. 46, 108 S.Ct. 876, 99 L.Ed.2d 41 (1988), *Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) and *Greenbelt Coop. Publishing Ass'n v. Bresler,* 398 U.S. 6, 90 S.Ct. 1537, 26 L.Ed.2d 6 (1970), the Supreme Court held that hyperbole is not actionable. Plaintiff contends that his statements were plainly hyperbolic because they were stated in an attempt to portray defendant's extremist position.

In addition, in the United States, courts look to the context in which the statements appeared when determining a First Amendment question. *Moldea v. New York Times Co.,* 22 F.3d 310 (D.C.Cir.1994), the most recent D.C. Circuit case concerning the First Amendment, confirmed the importance of context in a First Amendment analysis. In *Moldea,* the D.C. Court of Appeals reversed itself by admitting error and stated that "it is

---

**2.** The United States adopted a Constitution and Bill of Rights in order to provide Americans with greater rights than previously provided under British colonial rule. As a result, laws governing libel are structured around the goal to promote free speech and press, rights, Americans fought hard to secure. Since the United Kingdom lacks a Constitution, its laws appear to provide less protection for written and verbal expression.

in part the settings of the speech in question that makes their hyperbolic nature apparent, and which helps determine the way in which the intended audience will receive them." *Id.* at 314. Although the Supreme Court in *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990), failed to take context into consideration, the court in *Moldea* explained that "the Supreme Court did not reject the importance of context, but simply discounted it in the circumstances of that case." *Moldea*, 22 F.3d at 314. See also, *Ollman v. Evans*, 750 F.2d 970, 1010 (D.C.Cir.1984) (en banc) (Bork, J., Concurring) (stating that allegedly defamatory statements appearing on op-ed pages are "an assertion of a kind of fact, it is true, but a hyperbolic 'fact' so thoroughly embedded in opinion and tendentiousness that it takes on their qualities"). *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86 L.Ed.2d 278 (1985).

In the case at hand, the court notes that the British judgment was based on jury instructions which asked the jury to ignore context. Therefore, this court finds that if the statements were read in context to the original article or statement and in reference to the location of the statements in the newspaper, a reader would reasonably be alerted to the statements' function as opinion and not as an assertion of fact.

### C. *Limited Public Figure*

The Supreme Court in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964), explained that a public figure must show by clear and convincing evidence that the libel defendant published defamatory statements with actual malice. See *New York Times Co.*, 376 U.S. at 279–80, 84 S.Ct. at 725–26 (articulating that constitutional safeguards prevent a public official from recovering damages resulting out of defamatory remarks relating to his official conduct unless the remarks were made with actual malice or with reckless disregard of whether the remarks were false or not); *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 511, 111 S.Ct. 2419, 2429, 115 L.Ed.2d 447 (1991) (defining actual malice as "publication of a statement with knowledge of falsity or reckless disregard as to truth or falsity"). In *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) and confirmed in *Milkovich*, the Supreme Court extended this standard to a nonpublic person who is " 'nevertheless intimately involved in the resolution of important public questions or, by reason of their fame, shape events in areas of concern to society at large.'" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 336–337, 94 S.Ct. 2997, 3005, 41 L.Ed.2d 789 (quoting *Butts*, 388 U.S. at 164, 87 S.Ct. at 1996 (Warren, C.J., concurring in result)). See *Gertz*, 418 U.S. at 351, 94 S.Ct. at 3012 (defining a nonpublic person as one who "voluntarily injects himself or is drawn into a particular public controversy and thereby becomes a public figure for a limited range of issues").

The defendant in this case has described himself as a prominent activist for Human Rights in the Soviet Union since 1955.[3] Therefore, for purposes of his article about the composition of Russian personnel hired by Radio Free Europe/Radio Liberty, the court finds that the defendant was a limited public figure. In light of defendant's status as a limited public figure, the plaintiff is entitled to all the constitutional safeguards concerning speech used against public figures.

During the trial in England, because of British libel standards for the defense of "fair comment", the court never looked to the degree of fault or the accused party's intentions. Also, although the British court determined that the plaintiff's use of inverted commas around certain words may have falsely mislead a reader to believe that the defendant actually wrote those words, the court in *Masson* concluded that "a deliberate

---

**3.** In the British trial, the defendant testified that he, along with his colleagues, leaked information to the West so that millions of people would hear about the political persecutions in the Soviet Union. In addition, he was responsible for foreign relations for the Human Rights Movement and was a confident to several Soviet activists such as Alexander Solzhenitsyn, Andrei Sakharov, Yelena Bonner, and Vladimir Bukovsky. Moreover, he served as a broadcaster for the BBC during the Yom Kippur War, joined several organizations, and stated that he was known by an enormous amount of people.

alteration of the words uttered by a plaintiff does not equate with knowledge of falsity ... The use of quotations to attribute words not in fact spoken bears in a most important way on that inquiry, but it is not dispositive in every case". *Masson,* 501 U.S. at 517, 111 S.Ct. at 2433. As a result, since there appears to be no proof that the plaintiff made the statements with actual malice, the plaintiff enjoys the constitutional protection for speech directed against public figures.

For the reasons stated herein, the court grants summary judgment in favor of the Plaintiff. A separate order shall follow.