**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 01-10463 & No. 01-10773

THE SOCIETY OF LLOYD'S,

                                    Plaintiff - Appellee,


VERSUS


PERCY R. TURNER,

                                    Defendant - Appellant.

-------------------------

THE SOCIETY OF LLOYD'S,

                                    Plaintiff - Appellee,

VERSUS


JAMES DUNCAN WEBB,

                                    Defendant - Appellant.


Appeal from the United States District Court
For the Northern District of Texas

(6:00-CV-49-C & 3:00-MC-42-P)

July 25,2002


Before DUHÉ, BARKSDALE, and DENNIS, Circuit Judges.


1

DENNIS, Circuit Judge:[*]

In these consolidated appeals, Percy Turner and Duncan Webb appeal from the district courts' summary judgments in favor of the Society of Lloyd's (Lloyd's) recognizing the foreign judgments that it had obtained against them in an English court to collect underwriting obligations owed by them as American members of Lloyd's insurance syndicates.  We affirm.


I.    **FACTS AND PROCEDURAL HISTORY**

Through a succession of Parliamentary Acts (the Lloyd's Acts 1871-1982), the United Kingdom Parliament has authorized Lloyd's to regulate an English insurance market located in London, England. Some of the background as to the nature and structure of Lloyd's of London was set forth in <u>Haynsworth v. The Corporation</u>, 121 F.3d 956, 958-59 (5th Cir. 1997), by this court:

> . . . Lloyd's is a 300-year-old market in which individual and corporate underwriters known as "Names" underwrite insurance.  The Corporation of Lloyd's, which is also known as the Society of Lloyd's, provides the building and personnel necessary to the market's administrative operations.  The Corporation is run by the Council of Lloyd's, which promulgates "Byelaws," regulates the market, and generally controls Lloyd's administrative functions.
>
> Lloyd's does not underwrite insurance; the Names do so by forming groups known as syndicates.  Within each syndicate, participating Names underwrite for their own accounts and at their own risk.  That is, as a matter of

---

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

English law, Names' liability is several rather than joint, and individual Names are not responsible for the unfulfilled obligations of others. Each syndicate is managed and operated by a Managing Agent, who owes the Names a contractual duty to conduct the syndicate's affairs with reasonable care. Syndicates have no legal existence or identity apart from the Names they comprise.

Names must become members of Lloyd's in order to participate in the market. Prospective members are solicited and assisted in the process of joining by Member's Agents, whose duties to the Names are fiduciary in nature. Names must pass a means test to ensure their ability to meet their underwriting obligations, post security (typically, a letter of credit), and personally appear in London before a representative of the Council of Lloyd's to acknowledge their awareness of the various risks and requirements of membership, and in particular the fact that underwriting in the Lloyd's market subjects them to unlimited personal liability.

Participation in the market also requires the execution of a number of contracts and agreements, the most important of which is the General Undertaking, the standardized contract between Lloyd's and the individual Names. Names additionally must enter into a Member's Agent's agreement, the contract that defines the relationship between the Name and his chosen Member's Agent, and one or more Managing Agent's agreements, which define the relationships between the Name and the Managing Agents of the syndicates he wishes to join. Under the present version of Lloyd's Byelaws, each of these agreements must contain clauses designating England as the forum in which disputes are to be resolved and choosing English law as the law governing such disputes.

In the late 1980s and early 1990s, Lloyd's underwriters incurred billions of dollars of losses, due in large part to toxic tort cases. Because of the enormity of the outstanding liabilities and because of the Names' inability to satisfy their underwriting obligations, the very existence of Lloyd's was threatened. To ensure both the survival of the market and the payment of policyholders' claims, as well as to protect the Names, Lloyd's

3

devised the Reconstruction and Renewal (R&R) plan, which provided reinsurance for all the Names' pre-1993 liabilities from an independent company, Equitas Reinsurance Ltd. ("Equitas"). Equitas was funded, in part, by the reinsurance premiums paid by the Names.

Because one of the main goals of the R&R Plan was to allow the Lloyd's market to continue to function without being stalled by litigation, the Equitas policy included two key provisions, both at issue here. First, the contract contained a "pay now, sue later" provision, which precluded the Names from claiming any set-offs to the Equitas premium, except by way of a separate litigation after the payment of the premium was made.[2] Second, the Equitas contract contained a "conclusive evidence" clause, which provided that Lloyd's calculation of the premium owed constituted "conclusive evidence as between the Name and [Equitas] in the absence of manifest error."[3]

According to Lloyd's, 95% of the Names accepted the offer and paid the reinsurance premium. The remaining 5%, including Turner and Webb, refused to accept the offer and refused to pay. As Lloyd's was contractually authorized to do,[4] Lloyd's appointed a

---

[2] Equitas Reinsurance Limited Contract, cl. 5.5.

[3] Id. cl. 5.10.

[4] All Names signed a General Undertaking in which they agreed to "comply with the provisions of Lloyd's Acts 1871-1982, any subordinate legislation made thereunder, . . . any . . . requirement made or imposed by the Council [of Lloyd's]." Pursuant

4

substitute agent for the non-accepting Names. The substitute agent signed and accepted the Equitas reinsurance contract on behalf of the resistant Names.

Lloyd's paid the Equitas premiums for those Names, and Equitas assigned its right to collect the premiums to Lloyd's. In late 1996, Lloyd's brought collection proceedings in England against the recalcitrant Names, including Turner and Webb. Turner appeared through counsel and participated in the English action. But Webb, despite notice and being made a party, elected not to answer or defend in the English litigation.

The lengthy litigation that followed in England took place in a series of test cases. First, the English courts tried the Leighs case[5] to determine whether Lloyd's was entitled to appoint substitute agents to bind the non-settling Names to the R&R Plan, to enforce the Equitas contact, and to collect the premiums. The court found for Lloyd's, but allowed the plaintiffs to pursue their claims of fraudulent inducement against Lloyd's in a separate action. The English Court of Appeal upheld the trial court's decision, and leave to appeal was denied by the Judicial Committee

to Lloyd's Acts 1982, Schedule 2, § (18)(b), Lloyd's obtained the power to appoint substitute agents when the Council deemed it necessary. Through a series of bylaws and resolutions under this Act, the Council was authorized to appoint a substitute agent on behalf of Names specifically "to execute the Reinsurance Contract for itself and on behalf of the Members in such form as the council may direct. . . ." Lloyd's Byelaw No. 20 of 1983; Byelaw No. 82 of 1995; AUA9 Resolution of 1996.

[5] Society of Lloyd's v. Leighs & Others, (Q.B., Feb. 20, 1997).

of the House of Lords, the English equivalent of the United States Supreme Court.

The Names' claims for fraud were brought all together in the Jaffray action.[6]  Despite notice of this action from Lloyd's, neither Webb nor Turner joined in the Jaffray litigation.  Although the English courts found in favor of Lloyd's, the English Court of Appeal has granted permission to appeal, thus providing yet another avenue of review for this claim.

Following these decisions, Lloyd's sought summary judgment against the Names for the Equitas premium amount in the Fraser ligation.[7]  In this litigation, the Names challenged Lloyd's calculation of the reinsurance premium under the "conclusive evidence" clause.  In response, the Queen's Bench Division held several hearings, required Lloyd's to produce numerous documents regarding its calculation of the premium, and allowed the Names to present arguments regarding manifest error in Lloyd's calculation of the premium.  After lengthy review, the trial court ruled against the Names on this claim, and the English Court of Appeal denied leave to appeal.

The English court then entered summary judgment against Turner in England on March 11, 1998, holding him liable to Lloyd's for

---

[6] Society of Lloyd's v. Jaffray, 2000 WL 1629463 (Q.B. Nov. 3, 2000).

[7] Society of Lloyd's v. Fraser & Ors, (Q.B., Jan. 22 & Mar. 4, 1998).

6

approximately ^71,000. As Webb had chosen not to participate in any of the foregoing litigation, a default judgment against him had been entered on June 27, 1997, in an amount of approximately ^66,000. In May 2000, Lloyd's sought recognition of the English monetary judgments against Turner and Webb in separate divisions of the Northern District of Texas. In both cases, the Names sought summary judgment, asking for non-recognition of the English judgments, and, in both cases, Lloyd's filed cross motions for summary judgment, seeking recognition of the judgments. Both district courts granted summary judgment in favor of Lloyd's, holding that the English judgments were enforceable under the Texas Foreign Country Money-Judgment Recognition Act. Webb and Turner have both separately appealed and, because of the similarity of the cases, we consolidated them for review.

## II.  ANALYSIS

### A.   Standard of Review

We review grants of summary judgment de novo, employing the same standard as the district court.[8] Rule 56(c) of the Federal Rules of Civil Procedure allows the court to enter summary judgment in favor of the moving party only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

[8] Ramsey v. Henderson, 286 F.3d 264, 267 (5th Cir. 2002).

7

any material fact and that the moving party is entitled to a judgment as a matter of law."[9]

   B.   Foreign Judgment Recognition[10]

The Uniform Foreign Country Money-Judgment Recognition Act has been adopted by Texas and governs whether a judgment entered by a foreign nation will be recognized in this country.[11]   Under this Act, once a copy of a foreign judgment is filed with the clerk of the court in the county of residence of the party against whom recognition is sought, the party against whom recognition is sought may contest the judgment's recognition by filing a motion for non-recognition, which Turner and Webb have done.[12]  A court may refuse to enforce a foreign judgment if certain provisions of § 36.005 of the Civil Practice and Remedies Code are applicable.  Relevant here, "[a] foreign country judgment is not conclusive if . . . the judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law."[13]  Texas statutory law also provides a court

---

   [9] Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

   [10] Because the basis of this court's jurisdiction is premised on diversity, there is no dispute that Texas law applies to the recognition of these judgments.  Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1003 (5th Cir. 1990).

   [11] Tex. Civ. Prac. & Rem. Code Ann. §§ 36.001-36.008 (Vernon 2000).

   [12] Id. §§ 36.0041, 36.0044.

   [13] Id. § 36.005(a)(1).

8

with the discretion not to enforce a foreign country judgment if "the cause of action on which the judgment is based is repugnant to the public policy of this state."[14]

### 1. Due Process

As with all matters of statutory construction, we begin our analysis of the Texas Recognition Act by considering the plain language of the statute.[15] In that vein, we observe that the Texas Recognition Act requires that the foreign judgment be "rendered [only] under a system" that provides impartial tribunals and procedures compatible with "due process of law."[16] Moreover, as the

_____

[14] Id. § 36.005(b)(3).

[15] Southwest Livestock & Trucking Co., Inc. v. Ramon, 169 F.3d 317, 321 (5th Cir. 1999).

[16] Tex. Civ. Prac. & Rem. Code § 36.005(a)(1) (emphasis added); Society of Lloyd's v. Ashenden, 233 F.3d 473, 477 (7th Cir. 2000); Shwenke v. Texas, 960 S.W.2d 227, 230 (Tex. App.–Corpus Christi 1997, writ denied) ("When interpreting the intent and meaning of a statute, the court focuses on, and will follow, the plain language of the statute unless doing so leads to absurd and unintended consequences."); Ramon, 169 F.3d at 321 (5th Cir. 1999) (employing a plain language reading of the public policy provision of the Texas Recognition Act); 1 Restatement (Third) of Foreign Relations § 482 cmt. b (1987) ("A court asked to recognize or enforce the judgment of a foreign court must satisfy itself of the essential fairness of the judicial system under which the judgment was rendered."); see also Bridgeway Corp. v. Citibank, 201 F.3d 134, 137-138, 142-44 (2d Cir. 2000) (refusing to enforce a Liberian judgment because of "Liberia's judicial system was in a state of disarray and the provisions of the Constitution concerning the judiciary were no longer followed"); Bank Melli Iran v. Pahlavi, 58 F.3d 1406, 1410-13 (9th Cir. 1995) (concluding that after the Shah of Iran was deposed, the Iranian judicial system did not afford

statute requires only the use of "procedures <u>compatible</u> with the requirements of due process," the foreign proceedings need not comply with the traditional rigors of American due process to meet the requirements of enforceability under the statute.[17]  This provision has been "interpreted . . .  to mean that the foreign procedures [must only be] 'fundamentally fair' and . . . not offend against 'basic fairness.'"[18]

"The origins of our concept of due process are English, . . . [and] United States courts which have inherited major portions of their judicial traditions and procedure from the United Kingdom are hardly in a position to call the Queen's Bench a kangaroo court."[19]

---

protections compatible with due process); <u>Kam-Tech Syst. Ltd. v. Yarden</u>, 774 A.2d 644, 649-52 (N.J. Super. Ct. App. Div. 2001) (concluding that the defendant "has provided us with no basis for concluding that the civil justice system of the State of Israel can in any way be considered lacking the attributes of due process.").

[17] <u>Id.</u> § 36.005 (a)(1) (emphasis added); <u>Hilton v. Guyot</u>, 159 U.S. 113 (1895) ("[W]e are not prepared to hold that the fact that the [foreign] procedure . . . differed from that of our own courts is, of itself, a sufficient ground for impeaching the foreign judgment."); <u>Ingersoll Milling Mach. Co. v. Granger</u>, 833 F.2d 680, 687 (7th Cir. 1987); <u>Dart v. Balaam</u>, 953 S.W.2d 478, 480 (Tex. App.-Fort Worth 1997, no pet.) ("This ground for nonrecognition that requires impartial tribunals and procedures compatible with due process of law does not dictate that procedures be identical to those in the United States"); <u>Uniform Foreign-Money Judgments Recognition Act</u> § 4 cmt., U.L.A. (1986) ("[A] mere difference in the procedural system is not a sufficient basis for non-recognition.  A case of serious injustice must be involved.").

[18] <u>Ashenden</u>, 233 F.3d at 477 (citing <u>Ingersoll</u>, 833 F.2d at 687-88); 18B Charles Alan Wright et al., <u>Federal Practice and Procedure</u> § 4473 n.7 (2d ed. 2002)(quoting <u>Ashenden</u>, 233 F.3d at 477).

[19] <u>Id.</u> at 476 (citations omitted).

This court, in particular, has noted that "England [is] a forum that American courts repeatedly have recognized to be fair and impartial."[20]  In short, "[a]ny suggestion that th[e] [English] system of courts does not provide impartial tribunals or procedures compatible with the requirements of due process of law borders on the risible."[21]  Because "the courts of England are fair and neutral forums,"[22] the district courts did not err in recognizing the judgments that  Lloyd's obtained there.[23]

---

[20]  Haynsworth v. The Corporation, 121 F.3d 956, 967 (5th Cir. 1997).

[21]  Ashenden, 233 F.3d at 476 (citations omitted).  Moreover, given Webb's utter failure to participate in any stage of any of the English proceedings,"we not only look with skepticism, but we flatly reject the due process complaint of a party who 'was given, and . . .  waived, the opportunity of making the adequate presentation in the English Court.'"  British Midland Airways Ltd. v. Int'l Travel Inc., 497 F.2d 869, 871 (9th Cir. 1974) (quoting Somportex Ltd. v. Philadelphia Chewing Gum Corp., 453 F.2d 435, 441 (3d Cir. 1971)); see also Dart, 953 S.W.2d at 480 ("Grounds for nonrecognition may be waived if a party had the right to assert that ground as an objection or defense in the foreign country court but failed to do so.").

[22]  Id.

[23]  Id. at 477.  We need not speculate on the outcome of this case had the Names presented some evidence that the proceedings in their cases were "fundamentally unfair."  See, e.g., Banco Minero v. Ross, 172 S.W. 711 (1915) (a pre-Texas Recognition Act case refusing to recognize a Mexican judgment because the Mexican judgment was "a maze of words" that "appear[ed] to have been rendered on no proof whatever").  Instead, the Names complain that the special self-regulatory "Lloyd's[-]created system deprived [them] of due process." "The key question, [however,] is not the fairness of Lloyd's measures but the fairness of the English court in holding that Lloyd's was authorized by its contract with the [N]ames to appoint agents to negotiate a contract that would bind the [N]ames without the [N]ames' consent." Ashenden, 233 F.3d at

11

## 2. *Texas Public Policy*

Turner and Webb also argue that the district courts erred in enforcing the English judgments because they contravene the public policy of Texas. Under the Uniform Foreign Money-Judgments Recognition Act, "[a] foreign country judgment need not be recognized if . . . the cause of action on which the judgment was based is repugnant to the public policy of the state."[24] To deny

480. Webb and Turner have provided no evidence that the English court proceedings here were unfair. In fact, in evaluating the Names' claims, the English courts applied typical English law, discussed "general freedom to contract out of the right of set-off," and noted that the conclusive evidence clause is "not an unusual type of clause." Moreover, our colleagues from the Seventh Circuit have already concluded that the particular English proceedings of which Webb and Turner complain here do not run afoul of the due process provision of the Uniform Money-Judgement Recognition Act. Ashenden, 233 F.3d at 478-82. We find their reasoning to be persuasive and adopt it as our own.

[24] Tex. Civ. Prac. & Rem. § 36.005. While the Appellants' due process argument for non-enforcement of the English judgment is a "mandatory" grounds for non-enforcement under subsection (a) of the statute, the public policy argument offered here falls under subsection (b) of the statute, which grants the district judge the "discretion" not to enforce the judgment if he finds that one of the enumerated conditions are met. Although such a requirement seems to mandate an abuse of discretion standard, Banque Libanaise Pour Le Commerce v. Khreich, 915 F.2d 1000, 1004 (5th Cir. 1990), we have previously employed a de novo review in this context. Ramon, 169 F.3d at 321 (reviewing de novo a district court's summary judgment decision under the public policy prong of the Texas Recognition Act). As this court and the Supreme Court have noted, however, "'[l]ittle turns . . . on whether we label review of this particular question abuse of discretion or de novo, for an abuse of discretion does not mean a mistake of law is beyond

12

enforcement of a foreign judgment based on a public policy argument, the "level of contravention of Texas law has to be high. . . ."[25]

In conducting our analysis, we again begin with the "the plain language of the Texas Recognition Act" and note that it is "the cause of action on which the judgment is based" which must be contrary to Texas public policy before non-recognition is allowed.[26] In Southwest Livestock & Trucking Co., Inc. v. Ramon, we stated that "[t]his subsection of the Texas Recognition Act does not refer to the judgment itself, but specifically to the 'cause of action on which the judgment is based.' Thus, the fact that a judgment offends Texas public policy does not, in and of itself, permit the district court to refuse recognition of that judgment."[27] Ramon involved a "Mexican judgment [that] was based on an action for collection of a promissory note" with a 48% interest rate.[28] The Mexican court ruled in favor of the creditor and ordered the debtor

---

appellate correction." Id. at 321 n.3 (quoting Koon v. United States, 518 U.S. 81, 100 (1996)).

[25] Southwest Livestock & Trucking Co., Inc. v. Ramon, 169 F.3d 317, 319 (5th Cir. 1999).

[26] Id. at 321 (quoting Tex. Civ. Prac. & Rem. Code Ann. § 36.005(b)(3)).

[27] Id. at 321; see also Norkan Lodge Co. Ltd. v. Gillum, 587 F. Supp. 1457, 1461 (N.D. Tex. 1984).

[28] Ramon, 169 F.3d at 321.

to satisfy the debt and the 48% interest rate in full.[29]  The district court, however, refused to recognize the judgment because it violated Texas public policy.[30]  This court reversed, concluding that the district court erred in failing to recognize the Mexican judgment because the cause of action for collection on a promissory note did not offend Texas public policy.[31]

Lloyd's sued Webb and Turner for breach of contract and obtained a judgment in England on that cause of action.  In presenting their challenge here, Webb and Turner do not argue that a cause of action for breach of contract is contrary to Texas public policy, but instead claim that their particular judgments are contrary to Texas's breach of contract law because Lloyd's needed only to assert the existence of a contract and the amount owed, while Texas requires four elements to be established for a breach of contract claim (i.e., (i) the existence of a contract, (ii) proof of the plaintiff's performance, (iii) evidence of the defendant's breach, and (iv) damages).[32]  In short, the Appellants argue that the English judgments should not be enforced because the legal standards applied by the English courts are different from

---

[29] Id. at 319.

[30] Id.

[31] Id. at 323.

[32] Wright v. Christian & Smith, 950 S.W.2d 411, 412 (Tex. App. - Houston [1st Dist.] 1997, no writ).

the standards that the Texas courts would have applied, had Lloyd's brought its claim there.

Accepting the Appellants' characterization of English breach of contract law as true, the standard for non-recognition of a foreign judgment under the Texas Act is whether the "cause of action" is repugnant to state public policy, not whether the standards for evaluating that cause of action are the same or similar in the foreign country. In other words,

> [e]nforcement of a judgment of a foreign court based on the law of the foreign jurisdiction does not offend the public policy of the forum simply because the body of foreign law upon which the judgment is based is different from the law of the forum or because the foreign law is more favorable to the judgment creditor than the law of the forum would have been had the original suit been brought at the forum. The very idea of a law of conflicts of law presupposes differences in the laws of various jurisdictions and that different initial results may be obtained depending upon whether one body of law is applied or another.[33]

Because a breach-of-contract cause of action is not contrary to Texas public policy,[34] the district courts did not err in rejecting the claims of Webb and Turner and in recognizing the English judgments.[35]

---

[33] <u>Hunt v. BP Exploration Co.</u>, 492 F. Supp. 885, 901 (N.D. Tex. 1980).

[34] <u>See, e.g.</u>, <u>Wright</u>, 950 S.W.2d at 412; <u>Hussong v. Schwan's Sales Enters., Inc.</u>, 896 S.W.2d 320, 326 (Tex. App. - Houston [1st Dist.] 1995, no writ).

[35] Despite the clear language of the statute and this court's precedent, Webb and Turner also argue that the judgments in their particular cases violate the Texas public policy on cognovit

15

## III. CONCLUSION

For the foregoing reasons, the judgments of the district courts are AFFIRMED.

---

judgments and on the non-waivable protections of consumers from fraud and noncompliance with Texas securities laws. These arguments are without merit, as "[u]nder the Texas Recognition Act, it is irrelevant that the [foreign] judgment itself contravened Texas's public policy. . . ." Ramon, 169 F.3d at 321.