# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued October 28, 2005        Decided August 8, 2006

No. 04-7214

SOCIETY OF LLOYD'S,
APPELLEE

v.

GILLIAN MARY SIEMON-NETTO AND
UWE SIEMON-NETTO,
APPELLANTS

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv01524)

---

*Russel H. Beatie* argued the cause and filed the briefs for appellants.

*Stephen J. Jorden* argued the cause and filed the brief for appellee.

Before: SENTELLE and GARLAND, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the court filed by Circuit Judge GARLAND.

GARLAND, *Circuit Judge*: Defendants Gillian and Uwe Siemon-Netto are two among the hundreds of "Names" whom

the Society of Lloyd's has sued for nonpayment of reinsurance premiums. The English High Court of Justice, Queen's Bench Division, entered money judgments in favor of Lloyd's against the Siemon-Nettos. Lloyd's then sued to enforce those judgments in the United States District Court for the District of Columbia. The district court granted summary judgment in favor of Lloyd's, and we now affirm.

I

Eight circuit courts have set forth the background information that is relevant to this appeal.[1] Seeing no need to reinvent the wheel, we take our description of the context of this litigation from the Fifth Circuit's clear explications in *Society of Lloyd's v. Turner*, 303 F.3d 325 (5th Cir. 2002), and *Haynsworth v. The Corporation*, 121 F.3d 956 (5th Cir. 1997). *See also Society of Lloyd's v. Reinhart*, 402 F.3d 982, 988 (10th Cir. 2005) ("Numerous courts have summarized the basic facts applicable to the underlying litigation, and these facts are not in dispute.").

A

The Parliament of the United Kingdom authorized the Society of Lloyd's to regulate a London insurance market through a series of Parliamentary Acts, known as the "Lloyd's

---

[1]*See Society of Lloyd's v. Reinhart*, 402 F.3d 982 (10th Cir. 2005); *Lipcon v. Underwriters at Lloyd's*, 148 F.3d 1285 (11th Cir. 1998); *Richards v. Lloyd's of London*, 135 F.3d 1289 (9th Cir. 1998); *Haynsworth v. The Corporation*, 121 F.3d 956 (5th Cir. 1997); *Allen v. Lloyd's of London*, 94 F.3d 923 (4th Cir. 1996); *Shell v. R.W. Sturge, Ltd.*, 55 F.3d 1227 (6th Cir. 1995); *Bonny v. Soc'y of Lloyd's*, 3 F.3d 156 (7th Cir. 1993); *Roby v. Corp. of Lloyd's*, 996 F.2d 1353 (2d Cir. 1993).

Acts," passed between 1871 and 1982. In *Haynsworth*, the Fifth Circuit explained the structure of the Lloyd's market as follows:

> Lloyd's is a 300-year-old market in which individual and corporate underwriters known as "Names" underwrite insurance. The Corporation of Lloyd's, which is also known as the Society of Lloyd's, provides the building and personnel necessary to the market's administrative operations. The Corporation is run by the Council of Lloyd's, which promulgates "Byelaws," regulates the market, and generally controls Lloyd's administrative functions.

> Lloyd's does not underwrite insurance; the Names do so by forming groups known as syndicates. Within each syndicate, participating Names underwrite for their own accounts and at their own risk. . . . Each syndicate is managed and operated by a Managing Agent, who owes the Names a contractual duty to conduct the syndicate's affairs with reasonable care. . . .

> Names must become members of Lloyd's in order to participate in the market. Prospective members are solicited and assisted in the process of joining by Member's Agents, whose duties to the Names are fiduciary in nature. Names must pass a means test to ensure their ability to meet their underwriting obligations, post security (typically, a letter of credit), and personally appear in London before a representative of the Council of Lloyd's to acknowledge their awareness of the various risks and requirements of membership, and in particular the fact that underwriting in the Lloyd's market subjects them to unlimited personal liability.

Participation in the market also requires the execution of a number of contracts and agreements, the most important of which is the General Undertaking, the standardized contract between Lloyd's and the individual Names. Names additionally must enter into a Member's Agent's agreement, the contract that defines the relationship between the Name and his chosen Member's Agent, and one or more Managing Agent's agreements, which define the relationships between the Name and the Managing Agents of the syndicates he wishes to join. Under the present version of Lloyd's Byelaws, each of these agreements must contain clauses designating England as the forum in which disputes are to be resolved and choosing English law as the law governing such disputes.

*Haynsworth*, 121 F.3d at 958-59.

The *Turner* court described the insurance crisis that led to lawsuits like the one now before us:

In the late 1980s and early 1990s, Lloyd's underwriters incurred billions of dollars of losses, due in large part to toxic tort cases. Because of the enormity of the outstanding liabilities and because of the Names' inability to satisfy their underwriting obligations, the very existence of Lloyd's was threatened. To ensure both the survival of the market and the payment of policyholders' claims, as well as to protect the Names, Lloyd's devised the Reconstruction and Renewal (R&R) plan, which provided reinsurance for all the Names' pre-1993 liabilities from an independent company, Equitas Reinsurance Ltd. ("Equitas"). Equitas was funded, in part, by the reinsurance premiums paid by the Names.

. . . .

According to Lloyd's, 95% of the Names accepted the offer and paid the reinsurance premium.[2] The remaining 5% . . . refused to accept the offer and refused to pay. As Lloyd's was contractually authorized to do, Lloyd's appointed a substitute agent for the non-accepting Names. The substitute agent signed and accepted the Equitas reinsurance contract on behalf of the resistant Names.

*Turner*, 303 F.3d at 327-28.

The *Turner* court further explained the genesis of the referenced "contractual[] authoriz[ation]" that permitted Lloyd's to appoint a substitute agent for the recalcitrant Names:

All Names signed a General Undertaking in which they agreed to "comply with the provisions of Lloyd's Acts 1871-1982, any subordinate legislation made thereunder, [and any] requirement made or imposed by the Council [of Lloyd's]." Pursuant to Lloyd's Acts 1982, Schedule 2, § (18)(b), Lloyd's obtained the power to appoint substitute agents when the Council deemed it necessary. Through a series of bylaws and resolutions under this Act, the Council was authorized to appoint a substitute agent on behalf of Names specifically "to execute the Reinsurance Contract for itself and on behalf of the Members in such form as the

[2]As the Seventh Circuit explained, "Lloyd's levied an assessment (the reinsurance premium) against all the names [and then] offered a discount on the assessment to induce the names to go along with this plan voluntarily." *Society of Lloyd's v. Ashenden*, 233 F.3d 473, 478 (7th Cir. 2000).

> council may direct . . . ." Lloyd's Byelaw No. 20 of 1983; Byelaw No. 82 of 1995; AUA9 Resolution of 1996.

*Turner*, 303 F.3d at 328 n.3.

Finally, the Fifth Circuit described the English litigation against the recalcitrant Names, upon which the English judgments in this case are ultimately founded:

> Lloyd's paid the Equitas premiums for those Names, and Equitas assigned its right to collect the premiums to Lloyd's. In late 1996, Lloyd's brought collection proceedings in England against the recalcitrant Names . . . .

> The lengthy litigation that followed in England took place in a series of test cases. First, the English courts tried the *Leighs* case, [*Society of Lloyd's v. Leighs*, [1997] C.L.C. 759 (Q.B.)], to determine whether Lloyd's was entitled to appoint substitute agents to bind the non-settling Names to the R&R Plan, to enforce the Equitas contact, and to collect the premiums. The court found for Lloyd's, but allowed the plaintiffs to pursue their claims of fraudulent inducement against Lloyd's in a separate action. The English Court of Appeal upheld the trial court's decision, [*see Society of Lloyd's v. Leighs*, [1997] EWCA (Civ) 2283], and leave to appeal was denied by the Judicial Committee of the House of Lords, the English equivalent of the United States Supreme Court.

> The Names' claims for fraud were brought all together in the *Jaffray* action, [*Society of Lloyd's v.*

> *Jaffray*, [2000] EWHC (Comm) 51], . . . [in which] the English courts found in favor of Lloyd's . . . .
>
> . . . Lloyd's sought summary judgment against the Names for the Equitas premium amount in the *Fraser* litigation. In this litigation, the Names challenged Lloyd's calculation of the reinsurance premium . . . . After lengthy review, the trial court ruled against the Names on this claim, and the English Court of Appeal denied leave to appeal. [*See Society of Lloyd's v. Fraser*, [1998] EWCA (Civ) 1378.]

*Turner*, 303 F.3d at 328-29.

B

This brings us to the present litigation. Gillian and Uwe Siemon-Netto were among the Names who neither accepted their settlement offers nor paid the reinsurance premium for their outstanding underwriting liabilities. Nor did they take the opportunity afforded by the English courts to pursue separate fraud claims against Lloyd's. *See Society of Lloyd's v. Siemon-Netto*, No. 03-1524, Mem. Op. at 3 (D.D.C. Aug. 20, 2004).

On March 24, 1997, Lloyd's sued the Siemon-Nettos in England for breach of their contractual obligations to pay the reinsurance premiums. The Siemon-Nettos' counsel entered an appearance on their behalf. The English courts granted summary judgment against the Siemon-Nettos in the *Fraser* case, *see Society of Lloyd's v. Fraser*, [1998] EWCA (Civ) 1378, and on December 21, 1998, entered individual money judgments against Gillian Siemon-Netto for £280,055.72 and against Uwe Siemon-Netto for £87,109.97, *see Society of Lloyd's v. Gillian Mary Siemon-Netto*, Judgment (J.A. 116); *Society of Lloyd's v. Uwe Siemon-Netto*, Judgment (J.A. 119).

On July 15, 2003, Lloyd's filed suit against the Siemon-Nettos in the United States District Court for the District of Columbia, seeking recognition and enforcement of the English judgments under the District's Uniform Foreign Money Judgments Recognition Act of 1995 ("Recognition Act"), D.C. Code § 15-381 *et seq*. Venue was based on the Siemon-Nettos' status as District residents and jurisdiction on diversity of citizenship. *See* Compl. ¶¶ 6, 7. The Siemon-Nettos answered Lloyd's complaint and asserted a number of affirmative defenses and counterclaims. Lloyd's filed motions to strike the affirmative defenses under Federal Rule of Civil Procedure 12(f) and to dismiss the counterclaims pursuant to Rule 12(b).

The district court granted Lloyd's motions to strike and to dismiss. *See Society of Lloyd's v. Siemon-Netto*, No. 03-1524, Order at 1 (D.D.C. Aug. 20, 2004). Lloyd's then moved for summary judgment on its claims for recognition and enforcement of the English judgments, which the district court granted. *See Society of Lloyd's v. Siemon-Netto*, No. 03-1524, Order at 1 (D.D.C. Oct. 28, 2004). The Siemon-Nettos noted a timely appeal.

We consider the Siemon-Nettos' affirmative defenses in Part II and their counterclaims in Part III. Because the district court struck the former and dismissed the latter solely on grounds of legal insufficiency, we review those decisions de novo. *See Singletary v. District of Columbia*, 351 F.3d 519, 523 (D.C. Cir. 2003); *Fund for Animals, Inc. v. Norton*, 322 F.3d 728, 732 (D.C. Cir. 2003). The defendants "concede that without their affirmative defenses and counterclaims there [would be] no genuine issues of material fact," and that in such event summary judgment would be appropriate. Appellants' Br. 28.

9

II

Section 15-382 of the Recognition Act provides, in pertinent part, that "[e]xcept as provided in section 15-383," a "foreign-money judgment is enforceable in the same manner as the judgment of a sister jurisdiction which is entitled to full faith and credit." D.C. Code § 15-382.[3] Section 15-383 contains a list of specific exceptions, only one of which the Siemon-Nettos claim here:

> A foreign-money judgment need not be recognized if: . . . (3) [t]he cause of action on which the judgment is based is repugnant to the public policy of the District of Columbia.

D.C. Code § 15-383(b)(3). Concluding that none of the Siemon-Nettos' four affirmative defenses came within that exception, the district court struck them all as legally insufficient to bar enforcement of the English judgments. We consider the first defense in subpart A, and the remaining defenses in subpart B.

A

As their first affirmative defense, the Siemon-Nettos' contend that "the foreign-money judgment[s] obtained by Lloyd's in the courts of the United Kingdom [are] repugnant to the public policy of the District of Columbia and should not be recognized because the cause of action on which [they were]

---

[3]The Recognition Act is based on the Uniform Foreign Money-Judgments Recognition Act. *See* UNIF. FOREIGN MONEY-JUDGMENTS RECOGNITION ACT, 13 U.L.A. 261 (1991). The alert reader will note that, for no apparent reason, different authorities cited in this opinion insert a hyphen at different places (or not at all) within the phrase "foreign money judgments."

based conflicts with the public policy of the District of Columbia." Am. Answer ¶ 69. The defendants list three grounds for finding repugnancy: (1) "a contract cannot be enforced against the party who did not knowingly assent to its terms"; (2) "the legislation on which the foreign cause of action was based (Lloyd's Act 1982) and [the] Reconstruction and Renewal Byelaw were unenforceable and voidable as a result of Lloyd's failure to satisfy the conditions imposed on it by the Parliament in exchange for the legislation"; and (3) "the Lloyd's Act 1982 constituted an unlawful delegation of legislative and governmental power to Lloyd's, a private business entity." *Id*.

1. As their first ground, the defendants contend that the English judgments are repugnant to District public policy because they enforce a contract to which they did not assent. The contract at issue, they argue, is the Equitas reinsurance contract. That contract was not signed by them, but rather by the substitute agent appointed by Lloyd's to negotiate and sign for all Names who rejected the Reconstruction and Renewal (R&R) Plan. Recognition of such a contract, they insist, is repugnant to the general contract law principle that a contract requires mutual assent.

Section 15-383(b)(3) of the Recognition Act permits nonrecognition of a foreign judgment only if "the *cause of action* on which [it] is based" is repugnant to public policy. D.C. Code § 15-383(b)(3) (emphasis added). A cause of action is the legal authority (here, English contract law) that permits a court to provide redress for a particular kind of claim (here, Lloyd's contention that the defendants breached their obligations to pay the reinsurance premiums). *See Trudeau v. FTC*, No. 05-5363, slip op. at 18 n.15 (D.C. Cir. July 28, 2006). Accordingly, the dispositive question is whether the core principles of English contract law are repugnant to the public

policy of the District of Columbia, not whether any particular application of that cause of action is repugnant.[4]

That question is easily answered. As the district court noted, the Siemon-Nettos "have not suggested that English contract law principles differ substantively from those in the District of Columbia." Mem. Op. at 7 (Aug. 20, 2004). Indeed, District of Columbia contract law, like American contract law in general, is historically derived from (and similar to) the English common law of contract.[5] That being the case, it would be hard to regard the latter as repugnant to the former, and no federal court has done so. *See Reinhart*, 402 F.3d at 995 (holding that an English "breach of contract action" is not "repugnant to New Mexico public policy"); *Turner*, 303 F.3d at 333 (holding the same with respect to Texas public policy).

---

[4]*See Reinhart*, 402 F.3d at 995 ("reiterat[ing] that we must focus on the 'cause of action' and the 'claim for relief' underlying the English Judgment, not the differences in the bodies of law, because slight differences between England's and New Mexico's laws do not trigger the public policy exception"); *Turner*, 303 F.3d at 332 (noting that the Texas Recognition Act "does not refer to the judgment itself, but specifically to the 'cause of action on which the judgment is based,'" and thus that "the fact that a judgment offends Texas public policy does not, in and of itself, permit" refusal of recognition).

[5]*See, e.g.*, *Williams v. Walker-Thomas Furniture Co.*, 350 F.2d 445, 450 n.7 (D.C. Cir. 1965) (citing English common law in concluding that unconscionable contracts are unenforceable under District of Columbia law); 1 E. ALLAN FARNSWORTH, FARNSWORTH ON CONTRACTS §§ 1.5-1.7 (3d ed. 2004) (describing the development of American contract law from its English common law roots); *see also North Am. Graphite Corp. v. Allan*, 184 F.2d 387, 389 n.1 (D.C. Cir. 1950); *Meyer v. Washington Times Co.*, 76 F.2d 988, 992 (D.C. Cir. 1935).

The defendants do not suggest, for example, that English contract law principles permit parties to be bound to a contract without their consent. Rather, they contend only that this is the "practical effect" of the English judgments holding them responsible for a reinsurance contract they refused to sign. Appellant's Br. 18. But even if we were to consider repugnancy on such an "as applied" basis, we still could not find the judgments repugnant to public policy, because the English court did not bind the Siemon-Nettos to a contract to which they did not assent. To the contrary, it held them to a contract to which they did assent: the General Undertaking.

When the Siemon-Nettos became Names, they (not their agents) personally signed a "standardized contract between Lloyd's and the individual Names" known as the General Undertaking. *Haynsworth*, 121 F.3d at 959; *see* J.A. 25-26 (showing the signature of Gillian Siemon-Netto on a copy of the General Undertaking dated Sept. 9, 1986); J.A. 28-29 (showing the signature of Uwe Siemon-Netto on a copy of the General Undertaking dated Jan. 1, 1988). Under the General Undertaking, the Siemon-Nettos agreed to be bound by the Lloyd's Acts 1871-1982, as well as by current *and future* Lloyd's Byelaws. *See* General Undertaking ¶ 1; Oral Arg. Tr. at 11-12. The Lloyd's Act 1982 specifically authorized Lloyd's to make Byelaws for the purpose of appointing substitute agents to bind Names, *see* Lloyd's Act, 1982, Sched. 2, § 18(b), and such a "Substitute Agents Byelaw" was in existence when the defendants signed the General Undertaking, *see* J.A. 32-33. Thereafter, Lloyd's issued another series of Byelaws that authorized the appointment of "substitute agent[s] on behalf of Names specifically 'to execute the Reinsurance Contract for itself and on behalf of the Members.'" *Turner*, 303 F.3d at 328 n.3 (citing Lloyd's Byelaw No. 20 of 1983; Byelaw No. 82 of 1995; AUA9 Resolution of 1996).

It was no doubt risky for the defendants to agree to be bound by future Byelaws in this way. But the General Undertaking was no contract of adhesion. The Siemon-Nettos were investors who qualified for status as Lloyd's Names under a set of stringent criteria, and who presumably thought the upside potential was worth the downside risk (including the express risk of unlimited personal liability[6]). Regardless of whether we would reach the same disposition under District of Columbia contract law, we cannot say that the English courts' decision to bind the defendants under these circumstances is repugnant to the public policy of this jurisdiction.[7]

The defendants press upon us the case of *Matusevitch v. Telnikoff*, 877 F. Supp. 1 (D.D.C. 1995), *aff'd*, No. 97-7138,

---

[6]To be more precise: "Names bear unlimited liability for their proportionate losses in each syndicate they join. Their liability is several, not joint; no Name is ever responsible for the losses of those fellow Names who comprise the syndicate." *Roby*, 996 F.2d at 1357.

[7]*See Siemon-Netto*, Mem. Op. at 13 (Aug. 20, 2004) ("Unequal bargaining power is not a factor in a case like this one, where the Siemon-Nettos, as investors, had the free choice to become Names or not."); *see also Reinhart*, 402 F.3d at 996-97 (holding that binding the Names to the Equitas reinsurance contract did not violate New Mexico public policy because (inter alia) the Names were "highly sophisticated investor[s] who had to pass a 'means' test," the Equitas contract "was the implementation of specific provisions to address the unlimited liability undertaken by all Names pursuant to the General Undertaking Agreement's broad powers," and the Names were "not in a weaker bargaining position nor did Lloyd's compel [their] investment"); *cf. Ashenden*, 233 F.3d at 480-81 (ruling that "the English court['s] holding that Lloyd's was authorized by its contract with the names to appoint agents to negotiate a contract that would bind the names without the names' consent. . . . is not so unreasonable that it could be thought a denial of international due process even if international due process had a substantive component").

1998 WL 388800 (D.C. Cir. May 5, 1998), in which a district court declined to recognize an English libel judgment on the ground that enforcement would be repugnant to the public policy of the State of Maryland and of the United States. 877 F. Supp. at 4. But in *Matusevitch*, unlike this case, the district court noted substantial differences between a cause of action for libel in England and in the United States, including differences in both substantive law and burdens of proof. *Id*. at 4-6. Indeed, the subsequent history of that case, which neither the Siemon-Nettos nor Lloyd's mention, only sharpens the point. On appeal, this Court certified to the Maryland Court of Appeals the question of whether enforcement of the English judgment would be repugnant to the public policy of Maryland. *See Matusevitch*, 1998 WL 388800, at *1. We then affirmed the district court's judgment after receiving the following answer:

> A comparison of English and present Maryland defamation law does not simply disclose a difference in one or two legal principles. Instead, present Maryland defamation law is totally different from English defamation law in virtually every significant respect. Moreover, the differences are rooted in historic and fundamental public policy differences concerning freedom of the press and speech.

*Telnikoff v. Matusevitch*, 702 A.2d 230, 248 (Md. 1997) (internal citations omitted); *see Matusevitch*, 1998 WL 388800, at *1. The defendants have noted no similarly substantial differences between England and the District of Columbia with respect to the law of contract.[8]

---

[8]Among the differences found by the Maryland court were that, in contrast to Maryland law, under English law: "it is unnecessary for the plaintiff to establish fault, either in the form of conscious wrongdoing or negligence"; "defamatory statements are presumed to

15

2. The defendants' second ground for claiming that the English judgments are repugnant to District policy begins with their contention that the legislation (the Lloyd's Act 1982) that permitted Lloyd's to promulgate Byelaws -- particularly the Byelaws that authorized Lloyd's to appoint substitute agents to execute the reinsurance contract on behalf of the Names -- also imposed certain conditions on Lloyd's (i.e., the provision of better quality information to Names about the status of the Lloyd's market). *See* Am. Answer ¶¶ 40-43. The defendants argue that, because Lloyd's assertedly failed to satisfy those conditions, the Byelaws passed pursuant to that legislation "were unenforceable and voidable." *Id*. ¶ 69.

But the question of whether the Lloyd's Byelaws were valid under English law is itself a question of English -- not District of Columbia -- law. And it is a question that the English courts have already answered, concluding that the pertinent Byelaws are indeed valid. *See Society of Lloyd's v. Leighs*, [1997] C.L.C. 759 (Q.B.). We cannot reconsider that decision here. *See Medellin v. Dretke*, 544 U.S. 660, 670 (2005) ("[W]here 'comity of this nation' calls for recognition of a judgment rendered abroad, 'the merits of the case should not . . . be tried afresh . . . upon the mere assertion . . . that the judgment was erroneous in law or in fact.'" (quoting *Hilton v. Guyot*, 159 U.S. 113, 202-03 (1895)). Certainly the defendants have pointed to nothing about

---

be false unless a defendant proves them to be true"; "a qualified privilege can be overcome without establishing that the defendant actually knew that the publication was false or acted with reckless disregard"; a statement is presumed to be "one of fact, and the burden is on the defendant to prove 'fair comment'"; and there is "no special protection for defamation actions arising from critiques of public figures or public officials, [or] involving what American courts would characterize as core political discourse." *Telnikoff*, 702 A.2d at 247-48.

the principles applied by the English courts in reaching that decision that would render repugnant the contractual cause of action on which Lloyd's judgments are based.

3. The third ground advanced by the defendants is their claim that "the Lloyd's Act 1982 [itself] constituted an unlawful delegation of legislative and governmental power to Lloyd's, a private business entity." Am. Answer ¶ 69. But whether the Lloyd's Act constituted an "unlawful delegation" under English law is again a question that only the English courts can answer; in fact, it is a question that the act of state doctrine bars us from even asking. *See World Wide Minerals, Ltd. v. Republic of Kazakhstan*, 296 F.3d 1154, 1164 (D.C. Cir. 2002) (noting that the "act of state doctrine 'precludes the courts of this country from inquiring into the validity of the public acts a recognized foreign sovereign power committed within its own territory'" (quoting *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 401 (1964)).[9] Moreover, there is once again nothing in the defendants' argument to support the only ground the defendants advance for nonrecognition of Lloyd's English judgments: that

---

[9]As we have further explained:

> The act of state doctrine . . . . is applicable when "the relief sought or the defense interposed would [require] a court in the United States to declare invalid the official act of a foreign sovereign performed within" its boundaries. *W.S. Kirkpatrick & Co., Inc. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405 (1990). When it does apply, the doctrine serves as "'a rule of decision for the courts of this country,'" *id.* (quoting *Ricaud v. Am. Metal Co.*, 246 U.S. 304, 310 (1918)), which requires that, "in the process of deciding [a case], the acts of foreign sovereigns taken within their own jurisdictions shall be deemed valid," *id.* at 409.

*World Wide Minerals*, 296 F.3d at 1164-65.

the contractual cause of action on which those judgments are based is repugnant to District policy.

B

The district court struck the defendants' second, third, and fourth affirmative defenses as well as the first. Because the defendants do not appeal the loss of their second defense, *see* Appellants' Br. 14 n.10, we address only the third and fourth.

The third affirmative defense states: "Lloyd's does not have standing to enforce the judgments" because "neither Lloyd's nor Equitas paid the duty required by English law upon the transfer of the supposed R&R debt" from Equitas to Lloyd's. Am. Answer ¶¶ 91, 93. The defendants contend that any debts they owed for nonpayment of reinsurance premiums were owed to Equitas, not Lloyd's. They further assert that, because the transfer tax required to assign those debts to Lloyd's has never been paid, the assignment is invalid under English law and Lloyd's cannot enforce the judgments against them.

As the district court correctly noted, "this challenge to the validity of the assignment comes too late and is made in the wrong court." Mem. Op. at 9 (Aug. 20, 2004). The English judgments that Lloyd's seeks to enforce were entered in Lloyd's own name as plaintiff, not in the name of Equitas. They order the Siemon-Nettos to "pay the Plaintiff," not to pay Equitas. *Society of Lloyd's v. Gillian Mary Siemon-Netto*, Judgment (J.A. 116); *Society of Lloyd's v. Uwe Siemon-Netto*, Judgment (J.A. 119). Moreover, the English complaints on which those judgments were entered expressly asserted that Equitas had assigned its rights to the Siemon-Nettos' premiums to Lloyd's, and that the premiums were "due and owing from the Defendant[s] to Lloyd's." *E.g., Society of Lloyd's v. Gillian Mary Siemon-Netto*, Points of Claim ¶ 10 (J.A. 35). Proof of

that assignment was thus a part of Lloyd's English cause of action and, as we have noted, that cause of action is not repugnant to the law of the District. Nor have the defendants asserted anything about English principles of assignment of claims that would make it so.

Finally, the defendants' fourth affirmative defense merely states that "the amount alleged by plaintiff as due and owing is incorrect." Am. Answer ¶ 96. The district court struck this defense on the ground that it did "not even arguably fit into any of the specific exceptions enumerated in the [Recognition Act] and appear[ed], rather, to be an improper attempt to relitigate the merits of the underlying claims." Mem. Op. at 8-9 (Aug. 20, 2004). The court was obviously correct. The amount due and owing was an element of Lloyd's cause of action in contract, and as there is nothing repugnant about that cause of action, the fourth affirmative defense does not state a ground for failing to recognize it.

In sum, we conclude that the district court committed no error in striking any of the Siemon-Nettos' affirmative defenses under Federal Rule of Civil Procedure 12(f).

## III

The defendants' answer also asserts four counterclaims against Lloyd's: "negligent misrepresentation," Countercls. ¶ 152; "fraud," *id*. ¶ 155; "consumer fraud," *id*. ¶ 159; and "breach of fiduciary duty," *id*. ¶ 165. Each asserts, *in haec verba*, that Lloyd's failed to disclose and/or concealed "the extent of the losses generated by the asbestos and environmental claims," "the financial condition of the syndicates," and Lloyd's "accounting and financial controls for the syndicates." *Id*. ¶¶ 152, 155, 159, 165. The district court dismissed the counterclaims on the ground that the Siemon-Nettos had agreed,

by contract, that only English courts could hear such claims. *See* Mem. Op. at 10-15 (Aug. 20, 2004). We concur.

The General Undertaking, personally signed by each of the Siemon-Nettos, contains the following forum selection clause:

> Each party hereto irrevocably agrees that the courts of England shall have exclusive jurisdiction to settle any dispute and/or controversy of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's and that accordingly any suit, action or proceeding . . . arising out of or relating to such matters shall be brought in such courts . . . ."

General Undertaking § 2.2 (J.A. 25). Eight circuits have found the clause enforceable, *see supra* note 1 (citing cases), and the defendants do not contest its validity here, *see* Appellant's Br. 26.

The forum selection clause provides that the English courts shall have exclusive jurisdiction over any dispute "of whatsoever nature arising out of or relating to the Member's membership of, and/or underwriting of insurance business at, Lloyd's." We perceive no room for doubt that the defendants' misrepresentation, fraud, consumer fraud, and breach of fiduciary duty counterclaims all fall well within those confines.[10]

---

[10]*See, e.g.*, *Haynsworth*, 121 F.3d at 961, 970 (dismissing, on the basis of the forum selection clause, suits against Lloyd's by Names alleging fraud, breach of fiduciary duty, and violations of the Texas consumer fraud statute); *Bonny*, 3 F.3d at 157, 159 (same for suits alleging, inter alia, fraud, negligence, and breach of duty); *Roby*, 996 F.2d at 1358, 1366 (same for suits alleging violations of federal securities and racketeering laws).

As the district court noted, the "Siemon-Nettos' central claim [is] that they would not have become Names or renewed their memberships if they had known the truth about Lloyd's losses." Mem. Op. at 11 (Aug. 20, 2004). Indeed, at oral argument, the defendants conceded that their counterclaims are compulsory under the Federal Rules, *see* Oral Arg. Tr. at 15-16, which by definition means that they "arise[] out of the transaction or occurrence that is the subject matter of the opposing party's claim," FED. R. CIV. P. 13(a). The subject matter of that claim is the debt owed by the defendants arising out of their membership in, and underwriting of insurance business at, Lloyd's.

The defendants seek to avoid the effect of the General Undertaking's forum selection clause by contending that their counterclaims do not relate to their membership in Lloyd's, but rather to "Lloyd's handling of" the Lloyd's American Trust Funds (LATF) -- the funds into which all insurance premiums paid in U.S. dollars are deposited. Appellant's Br. 25. But that is simply not the case. Each of the counterclaims expressly "repeat[s] and reallege[s]," Countercls. ¶¶ 151, 154, 157, 164, the allegation of the defendants' second affirmative defense that: "Defendants would not have become Names and *would not have renewed their memberships* if they had known about the losses attributable to asbestos claims, the financial condition of the syndicates, or the lack of proper accounting and financial controls for the syndicates." *Id*. ¶ 85 (emphasis added).

In support of their contention that this case should be governed by the LATF deed, rather than the General Undertaking,[11] the defendants cite *In re Lloyd's American Trust*

---

[11]The LATF deed contains a choice of law clause (providing that disputes shall be governed by New York law), but does not contain a forum selection clause.

*Fund Litigation*, 954 F. Supp 656 (S.D.N.Y. 1997). That case involved claims brought by Names against Citibank, the trustee of the LATF. There, the court denied Citibank's motion to dismiss the case based on the forum selection clause of the General Undertaking. The court held that, because Citibank was neither a party to the General Undertaking nor "closely related" to one, it could not rely upon the clause. 954 F. Supp. at 670. But as the district court in this case correctly noted, unlike Citibank, Lloyd's "is more than 'closely related' to a signatory to the [General Undertaking] -- it is itself a signatory." Mem. Op. at 12 (Aug. 20, 2004). Accordingly, "it may invoke the forum selection clause to insist upon litigation in the United Kingdom." *Id.*

IV

At oral argument, counsel for the defendants made clear that the underlying basis of their defense is their belief that the English courts are biased in favor of Lloyd's: that is, that those courts have a "bias and prejudice in favor of Lloyd's under circumstances which make it impossible for a Name to win." Oral Arg. Tr. at 7. The Recognition Act includes an exception for this kind of defense to a foreign judgment, but it requires proof that the "judgment was rendered under a system that does not provide impartial tribunals or procedures compatible with the requirements of due process of law." D.C. Code § 15-383(a)(1).

The defendants do not assert that English courts fall within that category and could not prove it if they did.[12] Indeed, the

---

[12]*See Ashenden*, 233 F.3d at 476 ("Any suggestion that [the English] system of courts does not provide impartial tribunals or procedures compatible with the requirements of due process of law borders on the risible." (internal quotation marks omitted));

Siemon-Nettos' only evidence of the English courts' asserted "bias and prejudice" is that other Names in their position -- whose arguments they believe had merit -- lost their cases in those courts. But the fact that the Names' arguments did not prevail hardly establishes the partiality of the courts that heard them. Indeed, if it did, the fact that Names have lost similar (albeit not identical) cases in eight United States Courts of Appeals, *see supra* note 1, would require us to reach the same conclusion regarding American courts.

The judgment of the district court is

*affirmed*.

---

*Haynsworth*, 121 F.3d at 967 (noting that England is "a forum that American courts repeatedly have recognized to be fair and impartial"); *Riley v. Kingsley Underwriting Agencies, Ltd.*, 969 F.2d 953, 958 (10th Cir. 1992) (holding that "the courts of England are fair and neutral forums"); *British Midland Airways Ltd. v. Int'l Travel, Inc.*, 497 F.2d 869, 871 (9th Cir. 1974) ("United States courts which have inherited major portions of their judicial traditions and procedure from the United Kingdom are hardly in a position to call the Queen's Bench a kangaroo court.").